UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AEROTEL, LTD., AEROTEL U.S.A., INC., and
AEROTEL U.S.A., LLC,

         Plaintiffs,

  -against-

RADIANT TELECOM INC., et al.,

         Defendants.

04 Civ. 10292 (RJH)(FM)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

    This is an action for patent infringement brought by plaintiffs Aerotel Ltd., Aerotel U.S.A., Inc. ("USA Inc."), and Aerotel U.S.A., LLC ("USA LLC") (collectively, "Plaintiffs"). All defendants ("Defendants") have joined two motions to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. These motions were originally filed by the defendants in *Aerotel Ltd. v. IDT Corp.*, 03 Civ. 6496 (the "IDT litigation"), an action previously before this Court that had been consolidated for pretrial purposes with the instant action.[1] Defendants' first motion seeks dismissal of the complaint on the grounds that Aerotel Ltd. does not have legal ownership of the patent-in-suit and therefore lacks standing to sue for infringement. The second motion seeks dismissal of USA Inc. and USA LLC as plaintiffs on the grounds that these subsidiaries of Aerotel Ltd. do not have standing to sue in this action because they lack sufficient proprietary interest in the patent-in-suit.

    The subject matter of this litigation is U.S. Patent No. 4,706,275 ("the '275 patent"), entitled "Telephone System." The '275 patent is directed to "[a] telephone system enabling

---

[1] The IDT litigation settled in September 2007 while the instant motions were still pending.

prepayment for telephone calls," which allows a caller to make calls using any telephone by dialing a "special exchange" and inputting a code that provides access to that caller's prepaid amount. The cost of the phone call is deducted from the prepaid amount and the updated prepaid balance is stored in memory by the "special exchange" for future use. The sole inventor listed on the '275 patent is an Israeli citizen, Zvi Kamil.

Kamil filed an Israeli patent application for his invention in January 1985. The '275 patent was issued in the United States on November 10, 1987; it listed plaintiff Aerotel, Ltd. as the assignee of the patent. (Burling Decl. Ex. 13, Sept. 25, 2006.) Kamil had assigned all his rights in the '275 patent to Aerotel Ltd. in July 1987. (*Id.* Ex. 12.)

I. **Defendants' Motion to Dismiss the Complaint Based on the Alleged Divestiture of Kamil's Patent Rights Under Israeli Law**

Defendants contend that Aerotel Ltd. does not have legal ownership of the '275 patent and thus lacks standing to bring this action due to the operation of Section 132(a) of Israeli patent law, under which an employer takes ownership of an invention "arrived at in consequence of . . . and during" an employee's service. Israeli Patents Law § 132(a) (Isr.). According to Defendants, Kamil was divested of ownership by Israeli patent law when he conceived of the invention described in the '275 patent while working for either Beta Engineering and Development Ltd. ("Beta") in 1977 or Elscint, Ltd. ("Elscint") in 1984. Defendants also argue that Kamil was divested of ownership by the terms of an employment agreement which required him to assign inventions to Elscint.

Plaintiffs argue that Defendants' motion improperly asserts the equitable rights of third parties as a defense in a patent infringement action. The Court has already held that though "a third party's equitable rights in a patent may not be asserted as a defense" to patent infringement,

a defendant may challenge a plaintiff's standing in a patent infringement action based on a "statute or contract [that] constitutes a present assignment of future legal title," as opposed to "merely creat[ing] an equitable interest." *Aerotel Ltd. v. IDT Corp.*, 486 F. Supp. 2d 277, 281–82 (S.D.N.Y. 2007). While there is little evidence regarding the alleged employment agreement between Kamil and Elscint, the available evidence indicates that, if an agreement regarding ownership of inventions existed, it was not "a present assignment of future legal title," but merely obligated Kamil to assign certain inventions to Elscint. To the extent Defendants seek to challenge Plaintiffs' standing based on Kamil's failure to assign inventions pursuant to this agreement, Defendants are merely asserting the equitable rights of the third-party Elscint. Therefore, Defendants do not have standing to challenge Plaintiffs' ownership of the '275 patent based on Kamil's alleged employment agreement with Elscint.

The Court has held, however, that Defendants are permitted to challenge Plaintiffs' standing based on the operation of § 132(a) of Israeli patent law because this provision operates to automatically divest an inventor of legal ownership. *Id.* The Court will first review the factual underpinnings of Defendants' argument and then apply controlling principles of United States and Israeli patent law.

### A. Factual Background

#### 1. Elscint

In or around April 1978, Kamil began working for Elscint. (Valletta Decl. Ex. 1 ¶ 6, Dec. 21, 2006.) In an April 2006 declaration, Kamil characterized Elscint as "an Israeli medical imaging company involved in the production and development of CAT scanners and MRIs." (Johnson Decl. Ex. 3 ¶ 6, Jan. 10, 2007.) Plaintiffs have submitted statements from Sabbah

3

Benjamin, Elscint's Chief Operating Officer from 1969 to 1987, and Dan Inbar, Elscint's Vice President for Research and Development from 1976 to 1986, and Avraham Suhami, Elscint's Chief Executive Officer from 1969 to 1985.[2] All of these individuals state that Kamil was not involved in any way in telecommunications and/or telephony while at Elscint. Mr. Suhami further stated that during the period of Kamil's employment, Elscint's "main line of business was Medical Imaging." Defendants claim that while medical imaging may have been Elscint's "primary business," it was also involved in the development of technology relating to telephony. Defendant's evidence in support of this claim consists of (1) a 1979 Israeli patent application submitted by Elscint, entitled "Public Telephone with Push-Button Vandal Proof Dialer," and second, a printout from the website of the Memorial University of Newfoundland medical school that describes a 1992 "telenuclear medicine trial" in which "an Elscint communications software package was used to transmit nuclear medicine images via telephone lines." (Reply 6, Nov. 22, 2005; Valletta Decl. Ex. 4, Aug. 14, 2006;[3] Valletta Decl. Ex. 7, Oct. 3, 2006.)

It is undisputed that Kamil, while employed at Elscint, first worked as the "plant manager of the radiological division" and later as the "chief developer of MRIs." (Valetta Decl. Ex. 1 ¶ 6, Dec. 21, 2006.) The parties dispute, however, the date when Kamil stopped providing services to Elscint. Plaintiffs contend that Kamil ended his service for Elscint in September 1984 but continued to receive payment from Elscint for unused vacation time until January 1985. Defendants contend that Kamil was an employee of Elscint until January 1985, that is, during the period in which Kamil claims to have conceived of the invention of the '275 patent. Kamil stated in an April 2006 declaration that he left the employ of Elscint in "September or October"

---

[2] These statements were submitted as attachments to an April 12, 2007 letter to the Court from Plaintiffs' counsel.

[3] The August 14, 2006 declaration of Chryssa V. Valletta is attached to the September 8, 2006 Notice of Motion filed by the defendants in the IDT litigation.

of 1984 and that all of the income he received subsequently from Elscint constituted payment for unused vacation time. (*Id.* Ex. 1 ¶ 8.) Defendants argue that this assertion should not be credited in light of inconsistent prior statements regarding the period during which he was employed at Elscint, namely (1) a declaration filed by Kamil in the *Aerotel v. National Applied Computer Technologies* litigation in which Kamil states that he left Elscint in 1985 (Valletta Decl. Ex. 1 ¶ 4, Oct. 3, 2006); and (2) Plaintiffs' December 2005 Reply in the IDT litigation which states that Kamil "was employed by Elscint until in or around November 1984." The Court finds it unnecessary to resolve this dispute and assumes, *arguendo*, that Kamil conceived of the '275 patent while still employed by Elscint.

### 2. Beta

Kamil and two friends formed Beta in 1969. Kamil therefore contends that he was "not an employee" of Beta but a "co-founder[]" and "co-owner[]." (Kamil Decl. ¶ 2, Jan. 10, 2007.) Kamil left Beta in April or May of 1978. (*Id.*) Kamil describes Beta as a "development and manufacturing company to work on products and projects commissioned by external sources," that "never worked on any Beta-initiated products or projects" and "was never involved in any product or project relating to telephony or prepaid telephone systems." (*Id.* at ¶¶ 3, 4, 6.)

In 1977, Kamil drafted a document entitled "Public Pay Telephone Without Coins or Tokens," which describes a system for making calls from public telephones using "telephone call cards" with ten-digit codes that allow users to draw on prepaid phone "credits." (Valletta Decl. Ex. 5, Oct. 2, 2006.) Based on this document, Defendants contend that Kamil conceived of all or part of the invention of the '275 patent while associated with Beta in 1977. Defendants further contend that this invention became the property of Beta under § 132(a) of Israeli patent law.

5

Kamil has testified that "the general concept" of the 1977 document was completed "on [his] own time and at [his] own initiative," "was unrelated to [his] work at Beta," and "was unrelated to any work of Beta." (Kamil Decl. ¶ 7, Jan. 10, 2007.) Furthermore, Plaintiffs have submitted declarations from Yoel Amir, a co-owner and co-founder of Beta, and Omri Talmon, the Chief Executive Officer of Beta during Kamil's involvement with the company.[4] Both Amir and Talmon stated that "Beta had not been involved in telephony or public telecommunications fields" during Kamil's involvement with Beta.

Defendants offer no evidence that contradicts the accounts of Kamil, Amir, and Talmon but nevertheless assert that the 1977 document was the result of an internal Beta project. Defendants argue that Kamil's account should be disregarded because of its alleged inconsistency with previous testimony. Defendants note that Kamil testified during a September 2006 deposition that, in addition to helping Beta with various projects, he also tried to find additional projects for the company, and that Kamil answered affirmatively when asked whether "those would be projects that the company would fund and pursue."[5] (Valletta Decl. Ex. 1 at 37–38, Jan. 17, 2007.)

---

[4] These declarations were submitted as attachments to April 12, 2007 and May 9, 2007 letters to the Court from Plaintiffs' counsel.

[5] The testimony was:

> Q: [W]hat were you doing at Beta Engineering during that nine-month time period?
> A: I was helping the company in various projects.
> …
> Q: What else?
> A: I was trying to find more projects.
> Q: So you were in search of additional projects to bring to the company?
> A: Right.
> Q: And those would be projects that the company would fund and pursue?
> A: Yes.

(Valletta Decl. ¶ 2, Ex. 1 at 37:24–38:17, Jan. 17, 2007.)

### B. Discussion

Turning first to United States law, it is a plaintiff's burden to prove that it has standing to bring an action for patent infringement. *Sicom Sys., Ltd. v. Agilent Techs., Inc.* 427 F.3d 971, 976 (Fed. Cir. 2005) ("The party bringing the action bears the burden of establishing that it has standing."). However, "[p]atent issuance creates a presumption that the named inventors are the true and only inventors." *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1263 (Fed. Cir. 2007). It is undisputed that the '275 patent was issued to Kamil. It is well established that "[t]he issuance of a patent by the PTO is *prima facie* proof of the patentee's legal title." *Leighton Techs. LLC v. Oberarthur Card Sys., S.A.*, 531 F. Supp. 2d 591, 593 (S.D.N.Y. 2008); *see also Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 514 (S.D.N.Y. 2002) (citing *Elec. Auto-Lite Co. v. P. & D. Mfg. Co.*, 78 F.2d 700, 704 (2d Cir. 1935)); *see also Bellehumeur v. Bonnett*, 127 Fed. Appx. 480, 484 (Fed. Cir. 2005). Moreover, if Kamil was the owner of the invention described therein, his assignment to Aerotel Ltd. of his rights in the '275 patent was valid. Plaintiffs have, therefore, made a *prima facie* showing that Aerotel Ltd. is the owner of the '275 patent and has standing to bring this action. The burden thus shifts to Defendants to demonstrate that, though Kamil conceived of the invention leading to the '275 patent, ownership of this invention automatically vested in one of Kamil's employers by operation of Israeli law. Because Defendants' motion implicates foreign law, the Court previously requested expert affidavits regarding Section 132(a) of Israeli patent law and its application to the pending motions. *See* Fed. R. Civ. P. 44.1.

The text of Section 132(a) of the Israeli Patents Law reads as follows:

> An invention by an employee, arrived at in consequence of his service and during the period of his service . . . shall in the absence of an agreement to the contrary between him and his employer, become the property of the employer, unless the

> employer renounces the invention within six months from the day on which
> notification under section 131 is delivered to him.

Israeli Patents Law § 132(a) (Isr.).

As an initial matter, the Court finds that, under Israeli law, it is Defendants' burden to establish that Section 132(a) applies to Kamil's invention. Paragraph 76 of the Israeli Patents Law specifically provides that "[t]he person who submitted a patent application [is] deemed the owner of invention, as long as the contrary has not been proven." Plaintiff's expert has cited decisions of the Israeli Registrar of Patents and of the Tel Aviv District Court holding that it is the burden of the party asserting § 132(a) to prove that its requirements are met. (*See* Raday Decl. ¶¶ 38–43.) Since it is not disputed that Kamil submitted the January 1985 Israeli patent, Defendants have the burden of establishing either Elscint or Beta's ownership of the patent by operation of Section 132(a). In order to meet that burden, Defendants must show: (1) an employer-employee relationship; (2) an "invention" as defined by Israeli law; (3) an invention arrived at "in consequence of [the employee's] service" ("the causal test"); and (4) that the employee arrived at the invention "during the period of [the employee's] service" ("the temporal test"). (*Id.* at ¶ 19; Shalev Decl. 8–13.)

Focusing specifically on the third prong, the "causal test," the parties' experts appear to agree that Section 132(a) is based on the rationale that an employment relationship is a "deal" in which the employer pays for the employee's time and skills, and is therefore entitled to ownership of property which its resources and financing have been used to develop. (Raday Decl. ¶ 22; Shalev Decl. 10–11.) To establish whether an invention was made "in consequence of" an employee's service to his employer, Israeli courts consider the following factors: (a) the employee's duties; (b) the purpose of the employee's employment; (c) the scope of the employer's business; (d) whether the employee was instructed to perform the duties that led to

8

the invention (or whether the work leading to the invention was done at the employee's own initiative); (e) whether the employee was paid for the work that led to the invention; and (f) whether the employer's resources were used in developing the invention. (Raday Decl. ¶ 31; Shalev Decl. 12.) In addition, in a case cited by both experts, the court also considered the behavior of the parties and the nature of any contracts or agreements between them. (Raday Decl. Ex. 10 ¶ 5 (*Eitan Erez v. Shlomo Menachem*, SCA (T.A.) 4190/05).)[6] Applying these factors to the record before it, the Court concludes that the "causal test" is not met with respect to Kamil's employment with Elscint or his association with Beta.

With respect to Elscint, the evidence indicates that (1) Kamil's duties at Elscint were related to radiology and medical imaging, not telecommunications (*see, e.g.,* Valletta Decl. Ex. 1 ¶ 6, Dec. 21, 2006); (2) the purpose of Kamil's employment was to work as the "plant manager of the radiological division" and the "chief developer of MRIs" (*id.*); and (3) Elscint was a "medical imaging company involved in the production and development of CAT scanners and MRIs" (Johnson Decl. Ex. 3 ¶ 6, Jan. 10, 2007). Regarding this last point, the 1979 patent application filed by Elscint describes a mechanism to be used in the push-button keyboard of a pay telephone, intended to provide increased protection against vandalism and robbery. (Valletta Decl. Ex. 7, Oct. 3, 2006.) It addresses only the physical mechanism used to dial the telephone. Standing alone, this patent application does not indicate that Elscint was involved in the development of telecommunications products or services like the prepaid telephone system described in the '275 patent. Defendants' evidence relating to the Elscint "communications software package" used in the 1992 "nuclear telemedicine trial" does not indicate when it was

---

[6] Defendants' expert also states that "all inventions of employees, even when they have minimal ties with the employment, are considered 'service inventions'" subject to § 132(a), and that the relevant inquiry is whether "without the service the invention would not be created." (Shalev Decl. 12.) The cases cited by Defendants' expert provide no support for either proposition.

9

developed and does not describe any details about the technology. (*See* Valletta Decl. Ex. 4, Aug. 14, 2006.) It appears that it was used as part of a trial "to assess the accuracy and acceptability" of electronically transmitted medical images and was related to Elscint's medical imaging business—it does not indicate that Elscint was involved in the development of telecommunications technology. (*Id.*) Furthermore, there is no evidence that Kamil was instructed to undertake the work leading to the invention of the '275 patent, that Kamil was paid for the work leading to the invention of the '275 patent, or that Elscint's resources were used in developing the invention. Accordingly, the Court finds that the invention of the '275 patent was not arrived at "in consequence of" Kamil's service to Elscint and, therefore, that Kamil was not divested of his ownership rights by operation of Section 132(a).

Turning to the Beta relationship, the parties do not dispute that the 1977 document constituted an "invention" under Israeli law. The parties do dispute the extent, if any, to which this invention was the same as the invention of the '275 patent. The Court needs not resolve this dispute at this time but assumes *arguendo* that the invention of the 1977 document overlaps to some legally significant extent with that of the '275 patent.

Kamil has testified that the 1977 document was completed "on [his] own time and at [his] own initiative" and was unrelated to his or any other work at Beta. (Kamil Decl. ¶ 7, Jan. 10, 2007.) Kamil's account has been confirmed by another co-owner as well as by Beta's Chief Executive Officer from the relevant time period. The Court does not agree with Defendants' contention that Kamil's testimony regarding Beta is "totally contradictory" based on a single response during a deposition to a compound question that is, at best, ambiguous. In any case, even if Kamil's duties while at Beta did include seeking out projects for *Beta* to fund and pursue, there is no evidence that Kamil ever found any such projects, that any such projects were related

to telecommunications or telephony or, more specifically, that the 1977 document reflects a project that Beta could have or, in the ordinary course of business, would have considered undertaking.

Moreover, none of the "causal test" factors favors a finding that Kamil's invention was a service invention belonging to Beta under Section 132(a). The evidence indicates that (1) Kamil's duties at Beta included work on externally commissioned projects including computerized sewing machines and an "alpha beta gamma monitor" (Reply 5–6, Jan. 17, 2007); (2) the purpose of Kamil's employment was to work on and find such externally commissioned projects; (3) the scope of Beta's business was the development and manufacturing of externally commissioned products and projects; (4) Kamil did the work leading to the 1977 document on his own time and initiative; (5) Kamil was not paid for the work leading to the 1977 document; and (6) Beta's resources were not used in developing the invention. Accordingly, the Court finds that the 1977 document was not "arrived at in consequence of" Kamil's service to Beta, and therefore, that Kamil was not divested of his ownership rights by operation of Section 132(a).[7]

---

[7] By letter dated May 18, 2007, the defendants in the IDT litigation requested that Plaintiffs' April 12, 2007 and May 9, 2007 letters (and attached exhibits) should not be considered by the Court in connection with the pending motions to dismiss. The disputed letters and exhibits include the statements of Elscint and Beta executives, all of whom confirmed that Kamil's service for Elscint and Beta was unrelated to telecommunications and telephony. In the alternative, the IDT defendants requested that the Court reopen discovery at Plaintiffs' expense and for leave to renew their motion to stay pending resolution of related litigation in Israel. By letter dated September 20, 2007, Defendants in the instant action joined in this letter request.

Defendants argue that they would suffer "incalculable prejudice" from Plaintiffs' submissions because Plaintiffs' declarants had not been previously identified. Defendants argue that they have had no opportunity to "test the validity of the proferred affidavits and declarations via discovery, including depositions" and had based their motions only on the evidence obtained through discovery. By letter dated June 1, 2007, Plaintiffs responded, pointing out that the letters in question were submitted in response to the IDT defendants' February 13, 2007 letter to the Court, to which was attached a letter from Elscint's counsel in connection with related Israeli litigation asserting Elscint's ownership of Kamil's invention. According to Plaintiffs, the April 12, 2007 and May 9, 2007 correspondence were merely Aerotel Ltd.'s responses to the letter from Elscint's counsel in the Israeli litigation.

The Court denies Defendants' request to exclude these statements, which were directly responsive to the IDT defendants' own post-briefing submissions. The Court rejects Defendants' claim to have been prejudiced by these submissions. Defendants cannot credibly claim to have been unaware that Elscint and Beta executives from the relevant time periods might possess information relevant to the instant motion to dismiss. Moreover, Plaintiffs point out that two of the declarants, Omri Talmon and Yoel Amir, were specifically identified by Kamil during a September 13, 2006 deposition. The Court also rejects Defendants' suggestion that the statements of these Elscint

Since neither Elscint nor Beta is an owner of the subject invention by operation of § 132(a) of the Israeli Patent Law, Aerotel Ltd., as assignee of Kamil's invention, has standing to sue for infringement.

## II. Defendants' Motion to Dismiss USA Inc. and USA LLC

### A. Factual Background

Aerotel Ltd., as assignee of the '275 patent, has entered into agreements relating to the '275 patent with plaintiffs USA Inc. and USA LLC (the "USA Plaintiffs").

Under an April 30, 2000 agreement (the "USA Inc. Agreement"), USA Inc. was appointed as Aerotel Ltd.'s "exclusive representative in the United States to procure licenses for the patent," and is obligated to "use its bear [sic] efforts to enlist licensees" for the '275 patent. In consideration for its efforts, USA Inc. receives two percent of all payments relating to the '275 patent (such as royalties, judgments, and settlement payments).[8] Under the USA Inc. Agreement, all licenses were to be executed by Aerotel Ltd. and all changes to the "Aerotel Standard License Agreement" were to be approved by Aerotel Ltd. USA Inc. is permitted to use "only forms, applications, scripts, and advertising materials provided or approved by [Aerotel Ltd.]," and to make "no warranties or representations about the ['275 patent] other than as specifically authorized by [Aerotel Ltd.]" The USA Inc. Agreement provides that it "is personal to [USA Inc.] and may not be assigned."

---

and Beta executives contradict Kamil's deposition testimony. As discussed, Kamil's prior testimony is at best ambiguous regarding whether Beta's activities were limited to externally commissioned projects. In any event, the Court's resolution of Defendants' motion would not be different had these declarations been excluded from consideration.

[8] While USA Inc. must pay patent expenses and maintenance costs, it is reimbursed for these expenses out of the patent-related payments it collects.

Under a March 3, 2003 agreement (the "USA LLC Agreement"), USA LLC "shall serve as the representative of [Aerotel Ltd.]" and "do its utmost to collect by any legal means the debts for royalties due to [Aerotel Ltd.]" from specific companies identified by Aerotel Ltd. as having infringed the '275 patent. The USA LLC Agreement purports to grant USA LLC the right "to institute legal proceedings to that effect and take any legal action they [sic] deem right." USA LLC also agreed to use "best efforts" to enter into license agreements with the allegedly infringing companies and to oversee the implementation of any such agreements. In consideration for its services, USA LLC was entitled to a share of the revenue recovered through its enforcement efforts. (Nhaissi Decl. Ex. 3, Jan. 10, 2007.) Under the USA LLC Agreement, as in the USA Inc. Agreement, all licenses were to be executed by Aerotel Ltd. and all changes to the "Aerotel Standard License Agreement" were required to be approved by Aerotel Ltd.

### B. Discussion

A "suit for infringement of patent rights ordinarily [must] be brought by a party holding legal title to the patent." *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007). However, "[a] party that is neither the legal owner of the patent nor the transferee of all substantial rights in the patent still has standing to sue for infringement if that party has a legally protected interest in the patent created by the Patent Act, so that it can be said to suffer legal injury from an act of infringement."[9] *Id.* at 1193; *see also Intellectual Prop. Dev.*, 248 F.3d at 1345–46 (noting that party that has "some, but fewer than all, substantial rights" in a patent has standing to sue as co-plaintiff of the patentee). An exclusive licensee of a patent is deemed to

---

[9] A party without legal title to a patent but to whom "all substantial rights" in the patent have been conveyed "is treated as the patentee and has standing to sue in its own name." *Id.* Here, Plaintiffs concede that Aerotel Ltd. has not transferred "substantially all rights" to the USA Plaintiffs. (Pls.' Opp'n 1.) Thus, the USA Plaintiffs "do not contend that they have standing to sue alone." (*Id.*)

have such an interest. *Propat*, 473 F.3d at 1193. "Unlike the patentee or the transferee of all substantial rights in the patent, however, an exclusive licensee ordinarily may not sue in its own name alone, but must join the patent owner in an action brought against an accused infringer." *Id.*

In *Propat*, the Federal Circuit held that an agreement similar to the agreements between Aerotel Ltd. and the USA Plaintiffs did not confer sufficient rights in the patent-in-suit to confer standing to sue, even as co-plaintiffs with the patentee. *Id.* at 1189. In that case, an agreement between the plaintiff and the patentee purported to grant the plaintiff the right "to license the patent to third parties, to enforce the licensing agreements, and to sue infringers." *Id.* at 1190. The agreement also gave the plaintiff a "defined percentage share of the proceeds of the licensing royalties and of any judgment or settlement arising out of litigation." *Id.* Approval of the patentee was required for the plaintiff to license the patent, sue third parties for infringement, or transfer its rights under the agreement. *Id.*

The Federal Circuit held that the plaintiff in *Propat* did not have standing to sue, even as co-plaintiff of the patentee. *Id.* at 1194. The court noted that the existence of a "right to sue" clause in the agreement was not dispositive, because, under Supreme Court precedent, a patentee may not "assign[] the right to sue on a patent separate from the conveyance of a proprietary interest in the patent." *Id.* (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24 (1923)); *see also Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026,1034 (Fed. Cir. 1995) ("A patentee may not give a right to sue to a party who has no proprietary interest in the patent.").

In finding that the plaintiff "lack[ed] important indicia of a true ownership interest in the patent," the Federal Circuit emphasized that the plaintiff could not assign its interest, license the

14

patents, or sue infringers without the patentee's consent. *Propat*, 473 F.3d at 1194. The court also stressed that because the "agreement requir[ed] [the plaintiff] to 'use reasonable efforts consistent with prudent business practices' in its licensing and enforcement efforts," its position was "more consistent with the status of an agent than a co-owner." *Id.*

Though Aerotel Ltd.'s agreements with the USA Plaintiffs purport to "share" the right to initiate litigation and enforce the '275 patent, these provisions are without effect unless the USA Plaintiffs also possess a proprietary interest in the patent. *Id.* It is clear, however, that Aerotel Ltd. retains legal title to the '275 patent and retains substantial control over the USA Plaintiffs' actions under their agreements. Aerotel Ltd. is the entity that must execute any licenses to the '275 patent that are successfully negotiated by the USA Plaintiffs. Aerotel Ltd. also must approve all changes to the standard licensing agreement. The USA Inc. Agreement prohibits USA Inc. from using unapproved forms or advertising materials or from making any representations not specifically authorized by Aerotel Ltd. USA Inc. is also prohibited from assigning the USA Inc. Agreement.

Plaintiffs seek to distinguish *Propat* because, "in [*Propat*], unlike here, the only plaintiff was . . . a representative of the patentee. The patentee itself was not a party." (Pls.' Opp'n 11.) However, *Propat* specifically held that the plaintiff in that case had no standing to sue either in its own name or as a co-plaintiff of the patentee. *Propat*, 473 F.3d at 1192–94. Plaintiffs also argue that in *Propat*, unlike here, "the plaintiff and the patentee were not commonly owned companies." (Pls.' Opp'n 11.) However, there is no indication in the *Propat* decision whether or not the plaintiff and the patentee in that case were commonly owned. In any event, Plaintiffs do not explain why they believe common ownership to be a significant factor, not do they cite any case law to support such a distinction. Finally, Plaintiffs claim that here, unlike in *Propat*, "there

15

is no threat of multiple litigations . . . because every Aerotel entity having rights with respect to the '275 patent is named a plaintiff in this action . . . ." (*Id.*) The threat of multiple litigations does not distinguish *Propat*—the Federal Circuit held in that case that the plaintiff had no standing to sue, even as a co-plaintiff of the patentee. Nothing in the opinion suggests the existence of potential litigation by other parties with rights to the patent was a factor in the court's determination. The opinion did not rest on the threat of multiple litigations, but on the fact that the plaintiff in *Propat*, like the USA Plaintiffs, did not have a proprietary interest in the patent sufficient to support standing.

Thus, the Court concludes that the USA Plaintiffs, like the plaintiff in *Propat*, "lack[] important indicia of a true ownership interest in the patent" and do not have standing to maintain this action for patent infringement. *Propat*, 473 F.3d at 1194; *see also Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1343 (Fed. Cir. 2007) (holding that a plaintiff without "exclusionary rights and interests created by the patent statutes" is not injured by another party's infringement and therefore lacks constitutional standing).

### III.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint as to Aerotel Ltd. is denied, and Defendants' motion to dismiss the USA Plaintiffs is granted. The Clerk of the

Court is directed to remove Aerotel U.S.A., Inc. and Aerotel U.S.A., LLC from the caption, as they are no longer parties to this action.

SO ORDERED.

Dated: New York, New York
August 8, 2008

_____
Richard J. Holwell
United States District Judge